MELICENT WARING, EXECUTRIX OF HENRY WARING, *vs.* FRANCIS L. DARNALL, *et al.—December*, 1838.

The sale of land at a full price, by a trustee, appointed by will, not deriving its value from any quality or incident, which can be entirely destroyed, or materially impaired by such a contingency, as the construction, or non-construction of a public improvement, and only liable to be affected in price, by events which operate on agriculture generally, cannot be considered wilful negligence so as to subject the trustee for the loss which may be incurred, where one-sixth of the purchase is paid before possession is delivered, and a lien on the land is retained as a security for the payment of the balance in six annual payments, the interest on the whole sum to be paid annually.

The trustee will not, under such circumstances, be held responsible for loss, though he takes no other security; and more especially will he be excused, when by the words of the trust, he is to sell on such terms as he shall think best for the parties concerned.

There is no peremptory obligation upon a trustee, particularly when acting with the knowledge and approbation of a large portion of the parties interested, to sue upon a bond passed to him as trustee, the month, or the year, it becomes due.

Upon the proceeds of such a sale, the retention by the trustee, of a commission of eight per cent. under the sanction of the orphan's court, is too much—the allowance should not exceed five per cent. in analogy to the act of assembly.

APPEAL from the court of *Chancery.*

On the 25th May, 1836, *Francis L. Darnall, Henry B. Darnall,* and *Richard B. Darnall,* executors of the last will and testament of *Philip Darnall, Charles H. W. Wharton, Rebecca Wharton, John Scott, Francis Wharton,* and *Ambrose Wharton,* filed their bill in Chancery against *Melicent Waring, executrix of Henry Waring,* charging that *Elizabeth Smith* possessed of a large real and personal estate, departed this life about the 1st September, 1815, having devised her estate to her nephews and nieces (among others to the testator of the appellant, and *Philip Darnall*) in fee, in equal proportions, and appointed *Marsham Waring* and *Henry Waring* her executors, and authorized and directed them to sell all her real estate at public auction, and divide the proceeds among her nieces and nephews. The said bill after showing the connexion of the complainants with the estate of the said *Philip Darnall,* further alleged, that the said *Henry Waring* as surviving executor of the said *Elizabeth,* undertook the execution of the said will, and of the trusts thereby created, and as such executor became possessed, &c.—part of which he applied, &c., that a large surplus remained in the hands of the said *Henry Waring,* for which he has neglected and refused to account to your orators, and the other legatees of the said *Elizabeth Smith;* that there were large sums due to the said *Elizabeth,* which the said *Henry* might, and ought, with ordinary care and diligence, to have collected

and received; but owing to the negligence of the said *Henry* in conducting his said administration of the said *Elizabeth Smith's* estate, many of the said claims amounting to $6,000 have been lost, and for which the said *Henry* is justly chargeable. And the said bill further charged, that the said *Henry Waring*, in pursuance of the powers vested in him by the will of the said *Elizabeth Smith* and her husband *Richard Smith*, was entitled to one moiety of the lands after mentioned in said bill, did on or about the 3d day of December, 1816, sell and dispose of to one *William Lee*, all that tract of land called *The Grove*, at and for the sum of $18,000, and received the bond of the said *William Lee*, to the said *Henry Waring* and *Clement Smith*, to secure the payment of the purchase money in the following manner, to wit:—$3,000 to be paid 1st January, 1817, and the balance of $15,000, with interest annually, on the whole sum in six equal annual instalments, to be computed from 1st January, 1818; that the said *William* paid the $3,000, and afterwards at different times the interest which accrued on the balance of the said purchase money to the 1st January, 1827; that the said *Philip Darnall* in his life-time, received from the said *Henry Waring*, on account of the sales of the said land, $1,802 02, and that the said *Charles Wharton* received, &c.; that the said *Henry Waring*, omitted to institute any proceedings against the said *William Lee* to recover the amount of the several instalments as they became due, and did not institute proceedings until some time in the year 1828, against the said *William Lee* to recover, &c. That, owing to the negligence of the said *Henry Waring*, and his delay in prosecuting the said bond, and the indulgence granted to the said *William Lee* by the said *Henry Waring*, against the wishes and solicitations of the said *Philip Darnall*, and your orators, the balance due on the said bond was lost; for one half of which the said *Henry* is liable to complainant; that the said *Henry* is dead, and the said *Melicent* is his executrix. Prayer for an ascertainment of the assets of *Henry Waring*, and that his estate may be charged with his negligence, and for general relief.

At July term, 1836, *Melicent Waring,* as executrix, answered the said bill, and admitted that *Henry Waring,* as the surviving executor of *Mrs. Elizabeth Smith,* undertook the execution of her will, and that there came into his possession as executor a considerable property, consisting of an *undivided moiety* of the two tracts of land, " *Mount Essington*" and " *The Grove Point Farm,*" including, by resurvey, *Hazelmore,* both directed by the will to be sold, and of personal chattels on those lands, and of *choses* in action, but she utterly denies that the said *Henry Waring* has failed to account for the same, or any part thereof, or that any part of said *choses,* or other property, was lost through his negligence; that the said *Henry* did diligently and duly collect all said *choses* in action so far as collectable, and did faithfully account for the same, and for all other assets that came into his hands as executor aforesaid.  The answer, after setting forth the mode of accounting for the personal estate, proceeded to admit the sale of the *Grove farm* to *William Lee ;* that the sale was a *private sale,* by virtue of the power and authority of the legatees therefor exhibited with said answer, and also admitted the payments alleged to have been made by the said *William Lee* in the bill of complaint, and alleged that up to the 8th May, 1832, there was received in several sums on account of interest, partly from said *William Lee* directly, and partly through the execution of a judgment obtained against him on his said bond, the sum of $11,522 98, making an aggregate of $14,525 98, whereof the one-half and no more, was duly received by the said *Henry,* and duly accounted for.  The answer then admitted, that the defendant had no knowledge of any legal proceedings being instituted for the recovery of said debt, prior to the spring of 1827, when suit was brought on said *Lee's* bond, on which a judgment was in due course had, and also execution and recovery of a small part of the debt; that orders were given to sue him as early as 1824 or 1825 to counsel, but respondent did not know why said suit was not brought; that under the advice of counsel, suit was brought as early as April, 1830,

to enforce the equitable rights for the balance of the purchase money, and the land re-sold in December, 1831, by a trustee of this court for the sum of $10,800, part of which has been paid, and the balance is in a course of collection.   The answer also denied, that the debt of *William Lee,* or any part thereof, had been lost by the negligence of the said *Henry Waring,* or that he has been guilty of any wilful neglect or misconduct with respect to the same; that he diligently attended to its collection, and freely and fully communicated with his *c. q. trusts;* that the said *Henry Waring* was not bound to pursue the wishes of any particular legatee, but the dictates of his own judgment, guided by such lights as he could obtain, as to the best course for the common interest of all concerned, and therefore denies that he acted against the known wishes and solicitations of the complainants, or those under whom they claim, &c.

The parties sued out a commission under which the will of *Mrs. Smith* was returned, and a voluminous correspondence, covering many years in point of time, between the complainants, the owners of the other moiety of the land, the purchaser, and the defendant's testator; also various accounts settled before the Orphans courts in relation to the estate of *Mrs. Smith,* with the authority to *Henry Waring* from *Philip Darnall, Charles H. W. Wharton* and *Eleanor Brooke,* then owners of one moiety, under whom present complainants claim, to sell and dispose of at private sale without notice as specified in the will of *E. Smith,* all the devised estate on such terms as he may deem best for their interests.   The reporters deem it unnecessary for the illustration of the views of the appellate court to publish any further statement of the evidence in this cause.

On the 13th December, 1836, the chancellor (BLAND) referred the cause to the auditor, with directions to state an account, showing the amount now due from the defendant to the plaintiff.   The account is to embrace nothing more than what relates to the proportions of the purchase money of the lands sold to *William Lee,* as in the proceedings mentioned,

due to the plaintiffs, and their claim is to be considered as having accrued when the last instalment of that purchase money became payable, and to bear interest from that date until paid. The defendant is to be considered as absolutely liable to the admitted amount of assets, and for the balance, if any, due to the plaintiff, liable as assets may accrue.

In January, 1837, an account was reported in conformity with the chancellor's directions, and ratified: and the defendant below prosecuted this appeal.

The *cause* was argued before BUCHANAN, Ch. J., STEPHEN, ARCHER, and DORSEY, J.

C. Cox, for the appellant.

This is a suit instituted in the court of Chancery by the appellees *vs.* appellant, and presents the following case:

*Mrs. Elizabeth Smith*, of Prince George's county, died in the year 1815, seized and possessed of a considerable real and personal estate, which by her will and several codicils she bequeathed equally between several nephews and nieces and their representatives, with the benefit of survivorship in certain circumstances. Under the will and codicils, the estate, on her death, devolved on *Henry Waring*, (appellant's testator,) *Philip Darnall*, *Eleanor Brooke*, and *Charles H. W. Wharton*, equally between them, of whom *Henry Waring*, as survivor of *Marsham Waring*, was sole executor. On September 1st, 1821, *Wharton* conveyed his share to *Henry Waring* in trust for *Mrs. Wharton*, wife of *Wharton*, and her heirs, and on December 1, 1825, *Wharton*, wife, and *Waring* joined in conveying the same share to *John Scott* upon the like trusts. *Mrs. Wharton*, *Philip Darnall* and *Henry Waring*, died successively in the year 1835, and this suit was brought in the next year by the executors of *Philip Darnall*, *John Scott*, and the surviving *cestui que trust* under the deed to *Scott*, against the executrix of *Henry Waring*, for an account of the estate of *Mrs. Smith*, and payment of their proper shares thereof. In the progress of the suit the com-

plainants limited their prayer for an account to a single item in the administration, and admitting that in all other respects the estate of *Mrs. Smith* has been rightly administered, pursue their suit for this alone.    This item is the balance of the price of an undivided moiety of the " *Grove*" estate lying in Cecil county, and which *Henry Waring*, under the will of *Mrs. Smith* and the authority of the other legatees, in conjunction with *Dr. Clement Smith*, who owned the other moiety, sold to *William Lee* in December, 1816.    The entire purchase money of the tract was $18,000 ; of which the purchaser paid before receiving possession, and in lieu of collateral security, $3,000, and for the balance, passed his bond to *Waring* and *Smith* jointly, payable in six equal annual instalments to be computed from January 1, 1818, with interest on the whole amount annually.    Various payments were made on account of the debt, partly shown by the record, some by collections from *Lee* before suit, others by execution at law, and others by a re-sale of the " *Grove*" under a bill to enforce the vendor's equitable lien, of all which complainants received their full share ; but a considerable part of the debt will be lost.

The sale and its terms were with the full knowledge and sanction of the devisées of *Mrs. Smith*, and the complaint is only of wilful neglect in collecting the purchase money, and of loss therein in consequence of such neglect.

The history of the sale is briefly as follows : *Mrs. Smith*, by the first codicil to her will, provides for the sale of all her real and personal estate, at *public* auction, after four weeks advertisement, on such terms as her executors or the survivors should deem proper ; that they shall not be answerable for any losses excepting those arising from *wilful neglect*, and " to lessen their trouble" directs that the bonds and notes for the purchase money should, as far as practicable, be so taken as to admit of an easy division, and authorizes the executors, if they so choose, to call on certain persons to make the division between the parties entitled, which division should be final and binding on all parties.    The provision

for a sale was not understood by the parties to be imperative, and they supposed that they had the option of a division of the land in specie. They however desired a sale, and considered it for their advantage that the whole should be sold together. They believed too, that whilst the provisions of the will and codicils abundantly protected the executors, they did not equally promote their interests. They considered it highly advantageous to have the benefit of the executor's intelligence and experience in business, both in selling and collecting and distributing the purchase money without trouble to themselves. Hence, they induced the executor, for their accommodation and ease, to depart from the terms prescribed by the will, and assume these additional burthens. The only compensation offered to the executor for this gratuitous act of kindness involving the certainty of much trouble, and the probability, converted by the result into certainty, of no inconsiderable expense, is the present suit brought against his family to make them pay a debt that he could not collect. *Lee* purchased when a bloated prosperity of the agricultural interest had puffed the market of lands in the Middle States far above their intrinsic value, and hence the price stipulated by him proved very exorbitant. Before the first instalment of his bond became due, a re-action, consequent on the general pacification of *Europe*, had taken place, lands had fallen below half their former price, and he was involved in the general ruin that swept over the country. The debt became at once doubtful, and called for the exercise of a sound discretion in its collection. *Lee* could not pay this instalment, nor those that followed, at maturity; and craved some indulgence in consideration of the punctual payment of interest. The bond thus became forfeit at law, and two alternatives were presented to the executor and *Dr. Smith* associated with him in the bond. First.—They might enforce the extremest remedies of the law, and by sacrificing *Lee* without benefiting themselves, close the debt, and at once ascertain their loss. This course, whilst it disregarded the interest of the devisees of *Mrs. Smith,* no doubt squared with the strict

and narrow line of duty of the executor, and would protect him from responsibility.   But whilst it squared with this strict rule, it hardly harmonized with that spirit of mutual confidence and friendship, in which, a modification of the trusts of the will had been sought by the devisees, and conceded by the executor for their benefit.   The other alternative was in better keeping with this spirit.

Professing that the payment of his debts by every fair means made a part of his religion, and possessing energy and experience which he was willing to devote to the service of his creditors, *Lee* only asked an opportunity of rendering these available.   All the parties concerned, excepting perhaps *Philip Darnall*, united in advising indulgence; the professional advisor of the executor concurred in the recommendation; and thus forbearance was agreed on.  *Philip Darnall,* possibly, could not be conveniently consulted in advance; but if so, certainly gave his subsequent sanction to the course pursued.   The indulgence certainly involved no loss of the debt, and it was beneficial to the extent of the difference between the interest on the entire debt which was duly paid by *Lee* until 1827, and that, on the net price, that the land would have produced at any intermediate sale.   No certain stay appears to have been asked, and the only indulgence extended, was a forbearance to sue, whilst such course appeared for the interest of the devisees.   Connected with this was a constant vigilance in protecting the land which constituted the security for the debt, from all injury or deterioration, and the strictest diligence in pressing payment of *Lee* by all means short of legal coercion.

After the lapse of so many years, and when all the actors in the transaction, the executor, his counsel, advisers and agents, have died, it is impracticable to present an unbroken chain of evidence on this subject.   The record, however, shows that certainly as early as the maturity of the third instalment of the bond, there was a threat and distinct purpose of suing, which was averted (as it had been at the maturity of the first instalment) by the advice of the devi-

see's counsel. This purpose was renewed when the fifth instalment fell due, and was averted in like manner. It was again renewed after the last instalment became due, and was thenceforward only delayed by counsel because of *Lee's* absence from his county. Suit was actually brought to the spring term of 1827, of the Cecil County court, and judgment had in due course thereafter: under the advice of counsel, some stay was agreed to on terms advantageous to the devisees: afterwards an execution was issued, and a part of the debt made. In the spring of 1830, a bill was filed in the court of Chancery to enforce the vendor's lien for a balance of purchase money, under which the land was re-sold and the proceeds diligently collected and distributed.

The appellees insisted below, and it is supposed will now maintain that the testator of the appellant by failing to sue at the maturity of the first instalment of *Lee's* bond, was guilty of *laches* that made him individually liable for the debt.

The appellant insists on the following points:

*First.* The appellant's testator having survived for seventeen years after the alleged cause of action accrued against him: the devisees of *Mrs. Smith*, and their representatives, being during all this time in full possession of the facts and circumstances on which they rest their present suit, and not having laboured under any disability to sue: and the several agents of the testator, known to the appellees as the witnesses of the fidelity of his administration, having in succession and at intervals died without any intimation of a purpose on the part of the appellees requiring the perpetuation of their testimony; the claim will now be considered stale, and will not be entertained. *Willis on Duties of Trustees*, 222.

*Second.* If the suit be entertained the true issues will be, whether the appellant's testator was guilty of wilful neglect, and loss to the appellees has resulted therefrom. And in this point it is insisted:

1. That from the maturity of *Lee's* bond, the testator was vigilant and diligent in pursuing for its recovery all lawful means, excepting suit.

2. That the delay in suit was in the deliberate exercise of a sound discretion.

3. That it was sanctioned by the legatees, and so they are concluded from any objection to it.

4. That if the sanction of all be not shown, it is conclusively established as to *seven-eighths* in interest, and under the form and security given by *Lee*, and sanctioned by them, this is sufficient.

5. That the delay was discreet, and for the interest of the legatees.

6. That if not discreet, it would, at the worst, only show a want of sharp-sighted vigilance, not amounting to wilful neglect, and not involving responsibility.

7. That throughout, the testator acted by the advice of professional counsel.

*Diffenderfer vs. Winder*, 3 *G. and J.* 311, 341. *Gwynn vs. Dorsey*, 4 *G. and J.* 453. *Vez vs. Emery*, 5 *Ves.* 144. *Thompson vs. Brown*, 4 *Johns. Chy. R.* 619. *Peter vs. Beverly*, 10 *Pet.* 532, 556, 568.

The testator, under the advice of *Roger B. Taney*, esquire, settled an account of the proceeds of the land sold, in the Orphans court of *Prince George's county*, and was allowed a commission of 8 per cent. on the moneys collected. This allowance was not appealed from, but was by the chancellor overruled and set aside, and the expenses thereof disallowed. This is held to be error. *Scott, et ux. vs. Dorsey's Ad.* 1 *H. & J.* 227. The bond of *Lee* had to be collected, if at all, by attorney under suit; and the court of Chancery, as well as this court, will recognize that the expense of such collection is 5 per cent. on the amount, which was claimed and disallowed by the chancellor in the account taken. This disallowance is held to be error.

PINKNEY and JOHN SCOTT, for the appellees.

The neglect with which *Henry Waring* is charged, is,

1. That he omitted to take security from *Lee* to secure the payment of the purchase money.

2. That although *Lee* failed to pay the purchase money according to the contract, yet that no proceedings were taken by *Henry Waring* for more than ten years after the sale, and for more than eight years after *Lee's first* default, and that he is guilty of negligence for not suing upon his first, or at most, at his second default.

3. In not enforcing the vendor's lien at an early day after *Lee's* default.

4. It is denied that the delay in suing was with the sanction of the appellees or any of them, or that the delay was discreet or for the interest of the parties.

5. That the delay in suing amounted to gross negligence, especially taking into consideration the first neglect in omiting to require security from *Lee* under his insolvent circumstances.

6. That there is no evidence of such advice of counsel as justified or excused the delay.

7. That the allowance made to the said *Henry Waring* by the Orphan's court of Prince George's county of eight per centum on the sales of the real estate of *Elizabeth Smith,* was entirely without authority by the said court, and was properly rejected by the chancellor.

After adverting to the proceedings in the cause, its general history, referred to the bond of *Lee,* for the purchase money of the *Grove.* It was evident that no suit was brought on *Lee's* bond till 1827. A right of action accrued upon it 1st January, 1819. Then the bond was forfeited. This delay for eight years, was an act of gross negligence. *Hurst vs. Fisher,* 1 *Harr. & Gill,* 88. Again, the trustee *Waring* agreed to a stay of execution on the judgment against *Lee* for three years. No execution issued until December, 1830, and in the interim there was a failure to pay interest. This

is another act of negligence.   In 1821, he knew that *Lee* was
in failing circumstances.   In 1828, he should have proceeded
to enforce the vendor's lien.    He omitted this till 1830.
After April, 1830, there is no complaint of a want of dili-
gence in the prosecution of the Chancery suit.    These acts
of omission of negligence ought to charge the defendant,
unless he can show acquiescence or sanction by the other
party, or they must be shown not to have prejudiced the
complainants.    In 1825, if there had been any previous
sanction, it was then withdrawn, the complainant never sanc-
tioned any delay after that period.    If the trustee means to
escape responsibility under the sanction of his *cestui que trust*,
he must show the authority of all of them.    He cannot
escape liability to one upon the act or direction of another.
Neither *Mrs. Wharton* nor *Mr. Scott* acquiesced.    The at-
tempt of the proved delay, justified under the advice of
counsel, has failed :  such advice is not always a justification.
*King vs. King and Sharpe*, 3 *J. C. R.*, 552.

R. JOHNSON, in reply.

The bill, as to negligence in the administration of personal
assets, is now abandoned.    The only ground of complaint
relates to the sale of the *Grove* farm, and the violation of
duty consequent upon it.    The allegation in the bill is, that
the sale was made, and the bond taken, but that the money
due on the bond was not collected.    The negligence consists
in the failure to prosecute the security taken.    The com-
plainants can only rely on the breach of duty set forth in the
bill.    *Smith vs. Smith*, 4 *J. C. R.*, 281.    The argument
starts with a concession, that in the sale and the terms of it,
the trustee did his duty.    The codicil shows that the terms
of sale were left to the sound discretion of *Mrs. Smith's*
executor.    The proof shows that the parties interested au-
thorized *Waring* to sell on such terms as he might deem best
for their interest.    We have in this sale a cash payment of
one-fifth, and a lien on the property sold for the balance.
This is a sound execution of the power.    At the period of

sale in 1816, property was worth almost double the price of 1819, when the *first* instalment fell due. The interest on the exorbitant price, continued to be collected by the trustee till 1827. Up to that year, no want of diligence on the part of the trustee to the complainants in this bill. It is in proof that one of the *cestui que trust*, three years after, with knowledge of the delay, said he was satisfied—no cause to find fault.

This case can only be sustained for *gross* negligence. What is the test of that? It is the want of what men of ordinary prudence would have practised in the case. It is an inquiry of fact entirely. The parties interested authorized the sale of the whole estate. The complainants were interested in one-half; *Clement Smith* in the other. The security accepted, in pursuance of the original design, was for the entire sum. The proceeds must follow that original plan. The proceeds were to be divided upon collection. All as received. Now, the proof is, that Clement Smith, a joint owner of one-half, was the agent of the concern as to the Eastern Shore property. *Smith* thought it best not to proceed at law. There was no personal security for the balance. *Smith* held equal control with *Waring* over the contract. He was the agent of the concern, and there was no right to make *Waring* responsible for *Smith.* The parties left it to the prudence and honesty of *Smith*, and what he thought, he clearly shows.

There was no negligence until 1827. Then the bill was filed. Nor is there any evidence to show that *Waring* is responsible for the price of 1816, a great depreciation took place in property between 1816 and 1827.

The complainants made no efforts to induce *Waring* to enforce the judgment of 1828—they think they can stand by till his death in 1830, and then make his representatives pay. Their *laches* is evidence that *Waring* made all he could make prior to his death. They have received all he received. The presumption of law is in his favour. The codicil shows he was only responsible for wilful negligence. Such a clause

meant something.    It denies a stricter accountability than the testator intended.    Show an honest intent, an honest exercise of discretion in the execution of the trust, and then the will shields the trustee from accidental unexpected losses. *Waring* acted as he thought was his duty.    The person one-half interested in the property concurred with him.    Witnesses proved the discretion and excellence of his course.

The complainant must make out a case of negligence, and a loss from it.    The loss here results from a change of market depreciation of property between 1819 and 1827.    So far from being to blame, the property having fallen in value, as long as *Lee* paid the interest on the purchase money— equal to near 15 per cent. on the present value, it would have been gross blindness to the interest of the complainants to close the sale.    Then the opposite course cannot be negligence.

From 1825, onward, *Waring* acted under the advice of counsel.    All subsequent delay was submitted to under instructions.    Professional advice on facts of the case fairly communicated does excuse.    It releases, when followed, the party from the charge of negligence.    *Snow vs. Allen,* 2 *Serg. and Low.* 485.    9 *Serg. and Low.* 225.

Chambers, Judge, delivered the opinion of the court.

After a careful examination of the facts in this case, we have not been able to discover in the history they furnish of the trustee's conduct, such neglect of his duty, as to subject his representatives to the consequences claimed by the appellees.

The propositions of equitable law as to the extent of a trustee's liability, and the occasions in which it ought to be enforced, are all sound and defensible, as rules applicable to cases arising within their terms.

The difficulty springs from the necessity of considering the *peculiarities* of each case—upon which must depend the adaptation of those rules.    The vast variety of facts crowded into this record, need not be minutely enumerated, to make

intelligible the grounds of our opinion. The parties for whom the trustee acted were of full age at the creation of the trust, perfectly aware of their rights, as well as of the acts of the trustee; and as we think the facts prove, in relation to one item of alleged misconduct, that of selling the *Grove Point farm*, without additional security, assenting to the transaction. It is not to be understood, that without such assent, we should consider the terms of that sale a violation of the trust. The sale of a farm not deriving its value from any quality or incident which can be totally destroyed, or materially diminished in value, by an accident or contingency, such as the construction, or non-construction of some great public improvement—not liable to change as to its market price, except by the regular course of events, which operate on the agricultural prosperity of the whole country, the sale of such property at a full price, receiving one-sixth of the purchase money in cash before possession is delivered, and retaining the lien on the land as security for the payment of the balance, in six equal instalments, the interest to be paid on the whole sum annually, there being no imputation of fraud, cannot be considered wilful negligence, on which to found a claim against the trustee, for all damages that may afterwards be incurred, especially when the *cestui que trusts* are of full age, informed that a sale is about to be made, and do not instruct the trustee as to the terms; and, more especially, when by the words of the trust, he is to sell the property on such terms as he shall think best for the interest of the parties concerned. Nor can we discover in the subsequent proceedings of the trustee, the evidences of wilful neglect; one-half of the whole estate was owned and held by a man of active business habits; one-fourth of the other moiety by the trustee himself, whose character as a man of industrious devotion to his pecuniary concerns is proved in the cause. These two persons seem to have acted with discretion and prudence. Lands every where, not these only, had depreciated in value. If this property had been sold on the first default of the purchaser, it would have occa-

sioned an instant cessation to the large annual interest the vendors were receiving, and the proceeds would be largely deficient to meet the balance of the purchase money.

There is no peremptory obligation imposed upon a trustee, (especially when acting with the knowledge and approbation of much the largest portion of those interested,) to sue upon a bond passed to him as truetee, the moment, or the month, or the year it becomes due.   A due regard to the ultimate security of the debt, may require him to indulge the debtor, and if contrary to a reasonable expectation, any portion of the debt be lost, in the exercise of a fair discretion, regulated solely by an anxious effort to increase the ultimate security of the debt, the Chancery court will not visit him with the penalty of making good the loss.   The interest was regularly paid to the trustee by the purchaser, and by the trustee regularly distributed amongst the persons entitled, until after the year 1825.   In that year, and at some period prior to July, as appears by the first letter of *Levin Gale, Esq.*, he had been directed, if not to prosecute suit, at least to adopt such measures as his professional information should suggest. No allegation is made, nor any proof attempted, that in the selection of counsel the trustee and his associate indicated even a want of judgment, much less a want of inclination to do right.   Nor is there the slightest proof, that at any subsequent time they acted in any respect in contradiction to the advice of their counsel, or withheld from him any fact or circumstance which could aid him in forming a sound opinion on their case.

Indeed, the proofs in the case have not shewn, that the parties will necessarily sustain an ultimate loss, by the alleged delay in collecting the purchase money; certainly we can perceive nothing in the course of the trustee's proceedings which evinces, that such loss, if incurred, will be the effect of wilful neglect on his part.   If any thing has occurred since his death to make the collection of the debt more doubtful, or more difficult, it cannot, we think, be traced to any delinquency of the trustee in his life-time, and therefore cannot charge his estate.

We agree with the appellee's counsel, that the *eight* per cent. commission which was retained by the trustee under the sanction of the Orphans court was greater than it should be, and an account would be directed with instructions to allow 5 per cent. in analogy to the late act of assembly, but it is conceded by the counsel, that even with such reduction, such an account could not make any balance due to the appellees.

For these reasons, the decree of the chancellor is reversed, and the bill of the complainants dismissed, with costs.

DECREE REVERSED.